**In re John A. OBERLIES, Debtor.**

**Bankruptcy No. 88–09429.**

United States Bankruptcy Court,
E.D. Michigan, N.D.

Dec. 21, 1988.

Randall L. Frank, Bay City, Mich., Chapter 7 Trustee and for trustee.

Richard B. Learman, Bay City, Mich., for debtor.

## MEMORANDUM OPINION ON TRUSTEE'S OBJECTION TO DEBTOR'S CLAIM OF EXEMPTION BASED ON ENTIRETIES LAW

ARTHUR J. SPECTOR, Bankruptcy Judge.

The debtor is a principal stockholder and the president of Haddix Lumber and Supply Co., a Michigan firm which is the debtor in a Chapter 11 case pending in this Court. Mr. Oberlies and his wife accommodated Haddix Lumber by jointly guaranteeing the indebtedness owed by Haddix Lumber to Cotter & Co. ($79,930.61 according to its proof of claim); Caradco, a Kusan, Inc. company ($23,167.62 according to its proof of claim); and Lewis and Roberta Haddix ($502,090.81 according to their proof of claim). Mr. and Mrs. Oberlies own a home in Bay County worth, according to the debtor, approximately $100,000, which is encumbered by a mortgage with a balance of about $50,000. They also owned a home in Bay City, which they sold prior to Mr. Oberlies' bankruptcy, retaining a land contract vendors' interest therein for the balance due them. Shortly after the bankruptcy was filed, the vendee paid the balance; the trustee and the debtor hold this $27,000 jointly in escrow pending the resolution of this dispute. Under Michigan law, a homeowner may exempt only $3,500 of his/her homestead from execution. Mich.Comp.Laws § 600.6023(a)(8); Mich. Stat.Ann. § 27A.6023. However, real property owned in tenancy by the entireties is exempt from execution by a creditor of only one of the spouses. *General Electric Co. v. Levine*, 50 Mich.App. 733, 213 N.W. 2d 811 (1973).

Mr. Oberlies elected the state exemptions under 11 U.S.C. § 522(b)(2)(B), and claims that the two homes are exempt as properties held in tenancy by the entireties. The trustee timely objected to this claim of exemption, noting the three joint debts[1] itemized above. He maintains that to the extent of the aggregate amount of these joint debts, ($605,189.04 per those creditors' proofs of claim) he can administer the joint assets. *In re Grosslight*, 757 F.2d 773 (6th Cir.1985); *In re Trickett*, 14 B.R. 85, 5 C.B.C.2d 85 (Bankr.W.D.Mich.1981). The debtor's response was that he had negotiated settlements with each of the joint creditors which resulted in releases by them of his wife's guarantees; therefore, there are no longer any joint claims upon which the trustee can rely to defeat the claim of exemption. The trustee argues that since the joint claims were in existence at the time the bankruptcy was filed, the post-petition releases by the joint creditors were ineffective to defeat his claim to administer the joint assets. We thank each counsel for presenting us with excellently argued briefs, well documented by appropriate authority. It is a pleasure to be so well assisted by able counsel.

The trustee's major arguments, the last two of which were garnered from Kalevitch, "Some Thoughts on Entireties in Bankruptcy", 60 Am.Bankr.L.J. 141 (Spring, 1986), may be categorized as follows:

(1) Since the estate is measured at the moment the order for relief is entered, post-petition occurrences may not detract

---

**1.** "Joint debts" hereafter will refer to debts owed jointly by Mr. and Mrs. Oberlies. "Joint claims" are those claims for which the debtor and his wife are jointly liable. Likewise, a "joint creditor" is a creditor owed a "joint debt" as defined above. "Joint assets" are those properties held in tenancy by the entireties.

**918**

from it, citing *In re Sefren*, 41 B.R. 747 (Bankr.D.Md.1984).

(2) Neither § 726 nor § 501 of the Bankruptcy Code distinguishes between joint and non-joint claims, so there is no statutory authority for the distribution to two separate classes of unsecured creditors.

(3) By analogy to the doctrine of *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), under § 70(e) of the former Bankruptcy Act and to § 544(b) of the current Bankruptcy Code, it is entirely proper to allow the trustee to utilize a small joint claim as a lever to overturn an entireties exemption for the benefit of the general estate.

We will discuss these arguments *seriatim* and then take up the debtor's arguments.

*Post-petition conduct cannot affect the estate because the value of the estate is determined upon entry of the order for relief*

■ In *In re Sefren*, 41 B.R. 747 (Bankr.D.Md.1984), the debtor and his non-filing spouse owed the IRS $2,095 jointly for their 1982 federal income taxes. The trustee objected to the debtor's claim of exemption as to his $23,531 in entireties property. At the hearing, the debtor argued that there no longer was a joint claim because he paid the tax post-petition and so the trustee was powerless to administer joint assets. The court held as follows.

> Nor, does it matter for purposes of evaluating the entireties exemptions that the joint, unsecured debt was satisfied after this case was filed. Satisfying the joint tax debt did not retroactively make the entireties property exempt from process immediately before this case was filed. Because the entireties property was not exempt from process under Maryland law, then, it cannot be subsequently exempted in this case after the joint debt has been satisfied. Section 522(b)(2)(B). The decisive moment is "immediately before the commencement of the case ..."

41 B.R. at 748–749. If *Sefren* is correct on this point, the trustee must prevail on his objection to the debtor's claim of exemption.

The Code section which exempts entireties property, § 522, states:

> (b) Notwithstanding § 541 of this title, an individual debtor may exempt from property of the estate ... (2)(B) any interest in property in which the debtor had, *immediately before the commencement of the case*, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law. [Emphasis added.]

The trustee argues that "immediately before the commencement of the case" Mr. Oberlies and his wife were jointly liable to the three creditors. Therefore, the extent of the entireties exemption is reduced by the amount of the joint debts outstanding when this case began. The debtor offers no principled response to avoid the apparently plain effect of this statutory language.

Another case, not cited by either party here, which seemingly agrees with *Sefren* on this point, is *In re Sivley*, 14 B.R. 905, 5 C.B.C.2d 565 (Bankr.E.D.Tenn.1981). There, the debtor was married and owned entireties property at the time she filed her bankruptcy. Three weeks later, however, and while the estate was still being administered by the Chapter 7 trustee, the debtor obtained her divorce from her husband. Of course, upon divorce, the tenancy by the entireties was transformed into a tenancy in common. The court noted that "[t]he general rule is that the debtor's exemptions are determined as of the time of filing.... Furthermore, after filing, unsecured creditors generally cannot improve their rights against the debtors or the estate's property." *Sivley*, 14 B.R. at 910. But since the debtor acquired an interest in the property, that is, a tenancy in common therein, within 180 days after the commencement of the case "as a result of a ... final divorce decree," that particular post-petition occurrence caused the debtor to lose her right to exempt the property under § 522(b)(2)(B)'s entireties exemption provision. § 541(a)(5)(B). However, the debtor did

not lose her right to claim the property as exempt under Tennessee's homestead exemption law even though she no longer resided at the premises and she no longer had a spouse who resided there because her homestead exemption was determined as of the date the case commenced. Concededly, on that date, she did have a spouse who resided there. There was no statute like § 541(a)(5) which would allow the court to look past the date of the commencement of the case in this context.

These cases are in line with the general rule that all rights are defined at the moment the bankruptcy is filed. In another context, we stated with respect to the words "The commencement of a case" in § 541 that "the clear import of this provision is to freeze all rights of the estate at the instant the case is filed, and so post-petition conduct of the various parties, with limited exceptions ... is ineffective to alter the rights of the estate." *Mason v. Kish,* A.P. No. 86–7596 (unreported, September 23, 1987); *also see Northern Acres, Inc. v. Hillman State Bank,* 52 B.R. 641 (Bankr. E.D.Mich.1985). As the trustee here has cogently argued, accepting the debtor's reasoning would effectively write the words "immediately before the commencement of the case" out of § 522(b)(2)(B). Courts are required, if possible, to give effect to every word of a statute. *Weinberger v. Hynson, Westscott & Dunning, Inc.,* 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973); *In re Hall,* 752 F.2d 582, 586 (11th Cir.1985); *In re Co Petro Marketing Group, Inc.,* 680 F.2d 566 (9th Cir.1982). These words are easy to understand; there is nothing ambiguous or complex about them. They should therefore be interpreted according to their ordinary, contemporary, common meaning. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *In re Noggle,* 30 B.R. 303, 305 (Bankr.E.D.Mich. 1983). Even if there is a dearth of case law interpreting these words in § 522(b)(2)(B), substantially similar words appear in other portions of the Bankruptcy

Code, e.g., § 541.[2] The term "commencement of the case" uniformly refers to the date the petition for relief is filed when it is used in any other statutory context. "There is no reason why the words in one section in a Code should have any different meaning ascribed to them than nearly identical words appearing in other sections of the same Code. Indeed, they are to be interpreted consistently." *In re Rhein,* 73 B.R. 285, 288 (Bankr.E.D.Mich.1987); *United States Department of Labor v. Goudy,* 777 F.2d 1122, 1127 (6th Cir.1985). Accordingly, the trustee's objection to the debtor's claim of exemption with respect to these properties to the extent of the joint claims existing at the commencement of this case must be sustained.

### Effect of Joint Creditors' Waivers

The fact that the trustee's objection to the debtor's claim of exemption as to the two properties will be sustained and the exemptions disallowed does not end the dispute. Unless the trustee is given the right to administer these assets—which means to sell the home and to keep the proceeds of the pay-off of the former home —and then to distribute the proceeds to creditors, he has won a pyrrhic victory.

The debtor argues that even if the trustee has the theoretical right to sell the entireties assets, the proceeds of those sales are earmarked for the joint creditors. Since the only joint creditors have waived their right to receive such proceeds, the proceeds must be returned to the debtor and his spouse. Ergo, there is no justification for even conducting a § 363(h) sale.

The trustee asserts that even if the joint creditors choose not to receive the proceeds, the proceeds of the sale of joint assets are available to all other—i.e., non-joint—creditors of the estate, and so sale of the joint assets makes good sense. Thus we must now determine whether the trustee in cases like this one administers one estate (the regular bankruptcy estate) for

**2.** The term "commencement of the case" appears in 60 other locations in the bankruptcy

code aside from § 522 and § 541.

all creditors, and another estate (the entireties property) for joint creditors only.

## NO STATUTORY AUTHORITY FOR ADMINISTERING SEPARATE ESTATES FOR JOINT AND NON-JOINT CREDITORS

■ The trustee is obviously correct that no statutory basis exists for requiring the bankruptcy trustee to administer a separate estate within the context of the overall bankruptcy case for the benefit of joint creditors. However, the mere fact that the statutes do not specifically address the issue does not mean that the procedure is improper. The procedure is clearly a creature of judicial interpretation of state property rights. It is not unusual for there to be some tension when administering state property rights in a federal bankruptcy context. When there is a seeming clash, our duty is to abide by the state substantive law unless there is an overriding federal policy which ought to take precedence. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The absence of specific enabling legislation to direct the trustee to administer separate estates is not such an overriding federal policy. Thus, state law, which gives joint creditors, but only joint creditors, rights in entireties property, should prevail in this context.

The trustee cites procedural anomalies administration of two separate estates in a bankruptcy case would create. For example, where, as here, the estate has substantial priority claims against it, but not against the non-debtor spouse and if the entireties property is administered only for the joint creditors who happen to be otherwise unsecured, does the trustee pay the joint *unsecured* creditors all of the proceeds of the entireties property, or follow the priority ladder of § 726(a), which mandates that he pay claims entitled to priority under § 507(a) first before paying unsecured non-priority claims? This argument, however, fails to recognize the premise—two separate estates. If the priority creditor has no claim against the non-debtor spouse under applicable non-bankruptcy law, it could not collect its claim from the joint property.[3] Bankruptcy *administration* ought not effect any change in these substantive property rights. However, since joint creditors could collect from such property, bankruptcy laws ought not to be interpreted to dilute that substantive right by making it subject to *pro rata* distribution with others who lack such rights outside of bankruptcy. Therefore, if there are separate estates, the trustee ought not have any confusion; the proceeds of the sale of the entireties property must be distributed to joint creditors; if there are joint *priority* creditors, then § 726(a) mandates payment to them before paying joint non-priority creditors. If there are non-joint priority creditors, then they must be paid, if at all, out of the general estate funds.[4]

### Analogy to Doctrine of Moore v. Bay

Section 70(e) of the former Bankruptcy Act provided:

A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this Act which, under any Federal or State law applicable thereto is fraudulent as against or voidable for any other reason by any creditor of the debtor having a claim provable under this Act, shall be null and void as against the trustee of such debtor.

As *Colliers* explains:

Prior to the decision of *Moore v. Bay* ... it was thought in some quarters that the trustee should administer the recovery

---

**3.** This is strictly a hypothetical priority creditor other than the Internal Revenue Service since the I.R.S. does have rights, albeit limited, to realize on property held by tenancy by the entireties. *United States v. Rodgers*, 461 U.S. 677, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983).

**4.** Indeed, the trustee understood this very point by noting that paying non-joint priority creditors out of non-entireties assets only "makes no

sense unless of course one reads § 726 as completely bifurcated such that in non-exempt entireties property situations, there is in essence two Section 726's, one for joint claims, including joint priority claims under Section § 507 and Section 726 for distribution of non-exempt non-entireties property to single claimants." Trustee's Brief, August 24, 1988, p. 6–7.

only to and for the benefit of the creditor or creditors whose rights of avoidance were invoked. Some slight plausibility was given this proposition by the fact that in contrast to former section 67e, former section 70e made no mention of a recovery "for the benefit of the creditors of the bankrupt." The *Bay* case, however, effectively refuted such an idea, already denied by the weight of authority and if anything further was needed it was supplied by the draftsmen of the 1938 Act, who inserted in section 70e(2) the specification that every transfer or obligation shall be avoided by "the trustee for the benefit of the estate."

4B *Collier on Bankruptcy,* ¶ 70.95, p. 1105–1106 (14th ed. 1978).

The facts of the case were straightforward enough. Bay took a chattel mortgage in some cars, parts and equipment belonging to the eventual bankrupt on December 5, 1928. The document was recorded two weeks later. A state statute provided that a chattel mortgage is deemed to be "fraudulent and void as against existing creditors ... unless at least seven days before the consummation of such ... mortgage the ... mortgagor ... shall record ... a notice of such intended mortgage." Moore, the trustee in bankruptcy, argued that since there existed a creditor with a provable claim against the estate who had that claim at the time of the transfer, the transfer was void under state law. Although there was no real contest as to the transfer's invalidity as to those creditors who were in existence prior to recordation on December 19, the trustee argued that the transfer was also void as to those creditors who had become such after the recordation, even though under the state statute they would have had no right to upset the mortgage. The Ninth Circuit Court of Appeals rejected this contention. The Supreme Court, however, unanimously accepted it.

The questions presented in the trustee's petition for *certiorari* were: (1) Is the transfer to be set aside in its entirety, rendering it wholly void, or is it to be set aside only to the extent of the amount of the claims existing at the time the transfer was made; (2) How does the trustee distribute the proceeds of the avoided mortgage; and (3) Is the holder of the avoided mortgage paid in full ahead of creditors whose claims arose only after recordation? The Supreme Court held that the transfer is set aside in its entirety and that the trustee makes only one distribution, and it is *pro rata* to all creditors without distinction as to those which existed before or after the mortgage recordation. It also held that the holder of the avoided mortgage does not get paid before creditors who became such after the recordation, but instead shares as a general unsecured creditor in the *pro rata* distribution.

Although the decision was buffeted by substantial criticism and despite the fact that the National Bankruptcy Conference twice (1953 and 1954) voted to propose its statutory abrogation, Congress expressly approved it and continued it in the context of current Bankruptcy Code § 544(b). *See* Analysis of H.R. 8200, H.R.Rep. No. 595, 95th Cong., 1st Sess. 370 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6326; Analysis of S. 2266, S.Rep. 989, 95th Cong.2nd Sess. 85 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5871; 4 *Collier on Bankruptcy,* ¶ 544.03 (15th ed. 1988).

The trustee in the case at bench poses the identical questions as those addressed to the Supreme Court in *Moore v. Bay.* He maintains that the Court's decision that the trustee is to administer only one unitary estate for the benefit of all creditors equally notwithstanding that the trustee's right to avoid the transfer which created the asset for the estate derived from one or a handful of creditors only is a strong analogy which ought to be followed in this context. We reject the analogy for the following reasons.

Under both the former Bankruptcy Act and the current Bankruptcy Code, the avoided transfer is explicitly subordinated to all of the claims against the estate. Section 550(a) of the Bankruptcy Code expressly states that "to the extent that a transfer is avoided under § 544 ... the

trustee may recover, *for the benefit of the estate* the property transferred ...". Section 70(e)(2) of the former Act stated: "all property of the debtor affected by any such transfer [avoidable pursuant to § 70(e)(1)] shall be and remain a part of his assets and the state, discharged and released from such transfer and shall pass to, and every such transfer or obligation shall be avoided by, the trustee *for the benefit of the estate* ...". We recognize that, as noted by Colliers, § 70(e)(2) was amended to add the emphasized language only after *Moore v. Bay* was decided, and so it could have played no part in the Court's decision. However, other opinions, cited in *Moore v. Bay*, relied on statutory language in § 70e which "broadly provided that the trustee shall be vested, by operation of law, with the title of the bankrupt, to all 'property transferred by him in fraud of his creditors.'" *In re Kohler*, 159 F. 871, 873 (6th Cir.1908).

These are examples of federal statutes which expand or broaden the rights of creditors under non-bankruptcy law. This Congress may do under its constitutional authority to "establish ... uniform Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. art. I, § 8; *Butner v. United States, supra.* Assuming, then, that a state fraudulent conveyance law works for the benefit of creditors existing at the time of the transfer only,[5] Congress may create new remedies which apply to a broadened class of creditors. This is what it did with § 70(e) of the Act and § 544(b) of the Code. In the current context, however, there simply is no analogous statutory provision. Without such a provision, the courts are powerless to effect an improvement in creditors' rights.

### Trickett and Analogy to PACA Trust Administration

The debtor reminds us that the present procedure whereby the *trustee* objects to the allowance of a debtor's claim of exempt property by use of the entireties exemption is of fairly recent vintage. The use of the bankruptcy estate itself as a vehicle to vindicate the claims of joint creditors was first suggested by Judge Nims of the Western District of Michigan in *In re Trickett*, 14 B.R. at 88. *Grosslight* made the bankruptcy estate the preferred vehicle. Prior to that time, the most widely used method for a joint creditor to avoid the problem of the bankruptcy discharge of one spouse preventing the creditor from levying upon entireties assets afterward,[6] was to timely move the bankruptcy court for an order staying the entry of discharge and for an order for relief from the stay for the purpose of levying execution on the entireties assets. *See Lockwood v. Exchange Bank*, 190 U.S. 294, 23 S.Ct. 751, 47 L.Ed. 1061 (1903); *Sovran Bank v. Anderson*, 743 F.2d 223 (4th Cir.1984); *Trickett*, 14 B.R. at 88. "The distinction between the two views is of theoretical and procedural rather than substantive significance." *Grosslight*, 757 F.2d at 776. Therefore, according to the Court of Appeals, a joint creditor can still utilize the "prior practice" thereby circumventing the trustee entirely. If that result is palatable, it is only because the trustee himself, using the *Trickett* procedure, can be no more than the agent for the joint creditors anyway. This reasoning supports the two-estate model.

Although there is no statutory procedure for administering a separate estate for trust claimants under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a–499s, apart from the regular bankruptcy estate, it has been held that a trustee may administer a PACA trust res for the benefits of the PACA claimants solely. *In re United Fruit & Produce Co.*, 86 B.R. 14 (Bankr.D.Conn.1988). PACA provides protection to unpaid producers and shippers of fruits and vegetables. It requires a dealer in perishable agricultural commodities to hold the proceeds of the sales of such products in trust for the

---

5. *In re Kohler*, 159 F. 871 (6th Cir.1908), however, found that under Ohio fraudulent conveyance law *all* creditors share equally without reference to when their claims were incurred.

6. *See Harris v. Manufacturers National Bank*, 457 F.2d 631 (6th Cir.), *cert. denied*, 409 U.S. 885, 93 S.Ct. 118, 34 L.Ed.2d 142 (1972).

producers and shippers. When a dealer files bankruptcy, the unpaid producer or shipper may assert that the proceeds of sales of its commodity are not property of the estate, or, if they are, they are held strictly in trust for the producer/shipper, pursuant to 11 U.S.C. § 541(d). *See In re Fresh Approach, Inc.*, 51 B.R. 412, 13 B.C. D. 478 (Bankr.N.D.Tex.1985). The court in *United Fruit* noted that the United States Department of Agriculture, which is the federal agency directed to administer PACA, has commented that:

> Where USDA may become involved, an informal distribution would be made on a pro-rata basis to beneficiaries who have protected their rights to trust benefits. Where a court is involved, USDA would recommend to the court that the available trust assets be distributed on a pro-rata basis to all beneficiaries who have protected their right to trust benefits. 49 Fed.Reg. 45735 (1984).

86 B.R. at 16–17. On that basis, the court denied a PACA claimant's motion for relief from the stay in order to pursue the PACA assets outside of bankruptcy. It agreed with an opposing PACA claimant that the receivables derived from sales of PACA commodities be collected by the trustee for the benefit of all PACA claimants only. It cited *Tringali v. Hathaway Machinery Co.*, 796 F.2d 553 (1st Cir.1986) for the proposition that relief from the stay should be denied to a claimant who has a claim on a particular res so that the bankruptcy court can administer the res for the benefit of all other similarly situated creditors to "prevent a race to the non-bankruptcy courthouse". *United Fruit*, 86 B.R. at 16. *Trickett* expresses a similar policy concern with regard to entireties assets. 14 B.R. at 90. Without a procedure allowing the bankruptcy court to administer the entireties assets, there would likely be a "race by creditors for judgments and liens which give priority to the more aggressive creditors." *Id.* The policy of equal distribution to creditors in a single class is furthered by a procedure in which the bankruptcy court administers the asset. The fact that the trustee is the person who performs the physical acts of administration gives the

other creditors of the bankruptcy estate who lack the substantive rights of a joint creditor no claim to the proceeds.

PACA trust administration in bankruptcy and the *Trickett* case itself offer satisfactory procedures for ensuring equitable distribution of specific assets without enlarging the pool of beneficiaries. The trustee's arguments to the contrary, there is no good reason to depart from these already existing models for two-estate bankruptcy administration.

## CONCLUSION

The trustee may administer the joint assets only for the benefit of joint creditors. Joint creditors may waive their right to payment from the sale of such assets. *In re Dembs*, 757 F.2d 777 (6th Cir.1985). In this case, each of the three joint creditors has filed a proof of claim in which a joint liability is clearly established. No objection to any of the claims has been filed. These properly filed proofs of claim are therefore deemed allowed. 11 U.S.C. § 502(a).

■ The debtor *argues* that he negotiated a settlement with each of these claimants and has submitted what purport to be three duly executed settlement agreements. With respect to Cotter & Co. we find a "Settlement Agreement" dated May 28, 1988 in which Mr. and Mrs. Oberlies agreed to pay Cotter & Co. all of the net proceeds of the pay-off of their land contract which exceeds $6,000 (which is about $21,000) "in exchange for a release of" Mrs. Oberlies' liability to it. A similar "Stipulation for Dismissal and Settlement Agreement", dated June 23, 1988, was entered into in connection with a lawsuit filed in the federal district court by Caradco against Mrs. Oberlies. That agreement provided for Mr. and Mrs. Oberlies to pay $6,000 from the proceeds of the pay-off of the land contract in exchange for a release of Mrs. Oberlies' liability to Caradco. A "Settlement Agreement" was also allegedly executed between the Haddixes and the Oberlieses whereby the debtor would, among other things, transfer 10,000 shares of his stock in Haddix Lumber & Supply

Co., which were abandoned by the estate, in return for the Haddixes' release of Mrs. Oberlies, and other consideration.

We assume that the trustee will seek to sell the home pursuant to § 363(h) and to otherwise administer the $27,000 cash in escrow for the benefit of all joint creditors. If these purported settlement agreements are valid and if the joint creditors abide by the terms thereof and release Mrs. Oberlies of her liability to them, then there will be no joint creditors to partake in the proceeds of the sale of the joint assets. If that proves true, of course, there will be no purpose in selling the home or disbursing the $27,000 to anyone other than the debtor and his wife.

However, at the present time the record is insufficient to adjudge that waivers of these creditors' joint claims have been effected. Although a creditor may withdraw a claim as of right, it must do so in writing by filing a notice of withdrawal. Bankruptcy Rule 3006. None of the joint creditors has done that. Furthermore, a proof of claim may be amended as a matter of course at any time before an objection to its allowance is served. F.R.Civ.P. 15(a); 2 *Collier Bankruptcy Manual*, ¶ 502.02 (3rd ed. 1988), and by leave, freely given, thereafter, *Szatkowski v. Meade Tool & Die Co.*, 164 F.2d 228 (6th Cir.1947); *In re Pyramid Bldg. Co.*, 87 B.R. 38 (Bankr.N.D.Ohio 1988). None of the creditors has sought to amend its proof of claim to clearly and unequivocally assert a waiver of its joint claim. The trustee is therefore fully justified in assuming that these joint creditors still assert their joint claims and wish to accept their *pro rata* shares of the proceeds of the sale of the joint assets.

Accordingly, the trustee's objection to the debtor's claim of exemption as to the joint assets will be SUSTAINED.[7]

---

7. The trustee should get in contact with the joint claimants and determine whether they do intend to waive their right to participate in the "joint assets estate". If one or more declines to so waive, he should proceed to administer these assets in the appropriate manner.